**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERESA A. MARBARKER,** | : | **No. 3:06cv860** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL J. ASTRUE, Commissioner** | : | |
| **of Social Security,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

_____Before the court are plaintiff's objections (Doc. 12) to Magistrate Judge

Thomas M. Blewitt's report and recommendation (Doc. 11) proposing we deny

plaintiff's appeal of defendant's decision not to award her disability insurance

benefits and supplemental security income pursuant to Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401-33, 1381-1383f.

**Background**

This case began when the plaintiff filed an application for disability insurance

benefits and supplemental security income with the Social Security Administration on

December 24, 2003.  (Record (hereinafter "R") at 142-144, 328-330).  Plaintiff

alleged that she had been unable to work since May 18, 2002 as a result of a

disabling condition.  (Id. at 142, 328).  After a state agency denied her initial claims,

plaintiff filed a request for a hearing.  (Id. 107-110; 101).  Administrative Law Judge

(ALJ) Reana Sweeney held two video-conference hearings, one on December 15,

2004 and the next on June 14, 2005.  (Id. at 24-93).  The plaintiff, her attorney and a

vocational expert were present at the first of these hearings.  (Id. at 26-29).  This

hearing ended shortly after it began, since plaintiff had only recently obtained an

attorney and no medical evidence was available.  (Id. at 33).  The plaintiff proceeded

*pro se* at the next hearing, which was also attended by a vocational expert.  (Id. at

31-93).

The hearing before ALJ Sweeney revealed that plaintiff was 45 years old.  (Id.

at 38).  She had a high school education, and did not complete any further

vocational, technical or other training.  (Id. at 43).  She claimed no difficulties in

reading, writing or speaking English, and no problems with simple arithmetic.  (Id.).

Beginning around 1990, plaintiff worked as a payroll assistant in a manufacturing

company for six months.  (Id. at 48-49).  Shortly after leaving this job, she began

working as a "technician" at Proctor and Gamble.  (Id. at 44).  Plaintiff remained for

thirteen years, "mak[ing] paper towels and toilet paper."  (Id. at 44).  She operated a

machine.  (Id.).  Plaintiff testified that she became disabled on May 18, 2002, when

she left her job at Proctor and Gamble because she "could no longer work;" her body

"just gave out."  (Id. at 38, 46).  Her employer no longer had any work "that was

suitable for [her] injury."  (Id. at 38).  She had previously worked as a "technician" on

the floor."  (Id.).  Plaintiff later attempted to work in a nursing home, but had to quit

after one month because she "was completely disabled again."  (Id. at 39).  This

work, which ended in August 2004, was the only work she had performed since

2

leaving Proctor and Gamble.  (Id.).

Plaintiff also testified to her medical condition.  ALJ Sweeney asked plaintiff "from your perspective what do you believe is wrong psychologically?"  (Id. at 58). Plaintiff responded that she had been diagnosed as "bipolar," and that she was "manic," and suffered from "depression."  (Id.).  Plaintiff testified that she had used marijuana in the recent past, and that her doctors had told her she "was self-medicating to try to get through the bipolar."  (Id. at 60).  She claimed that she did not drink alcohol, and that her use of marijuana was infrequent, and only within the past year.  (Id. at 62).  Plaintiff also claimed physical limitations.  She contended that she could not sit or stand for more than twenty minutes without experiencing significant pain.  (Id. at 65).  "Numbness" in her fingers made handling and fingering difficult.  (Id.).  This numbness also extended "down my legs and my arms with [her] back, and [she] also" experienced neck arthritis.  (Id.).  "[F]rom head to toe I have problems."  (Id.).  She also complained of arthritis in her neck, "constant" pain in her ribs, and headaches.  (Id. at 74).  She also suffered from "bad knees," with "cartilage [rubbing] on cartilage."  (Id. at 78).  This pain caused difficulty sleeping, and plaintiff could not lay on her back or her left side.  (Id. at 77).  Plaintiff did not receive physical therapy or have surgery to deal with this pain.  (Id. at 69-70).  She testified, however, that she took medication to address these issues.  (Id. at 72).

When asked to describe a "typical" day in 2003, plaintiff testified that she arose between 9:00 and 10:00, and then she began to "walk."  "I walk all day.  I walk

3

back and forth." (Id. at 76).   After a morning meal, she began to walk.  (Id.).  This walking took place "[a]round my house, inside the house, outside the house.  That's really the only relief I can get is just to walk."  (Id.).  Though she testified that she "couldn't even imagine" how far she walked in a typical day, she put that number at "ten, fifteen, twenty miles."  (Id.).  She continued to engage in such ambulatory activity at the time of the hearing.  (Id. at 77).

ALJ Sweeney also examined medical evidence an other reports in making her decision.  On December 12, 2004, Dr. Clarence Maast, plaintiff's treating physician, completed a Lumbar Spine Residual Functional Capacity (RFC) Questionnaire based on his treatment and knowledge of plaintiff's condition.  (Id. at 273).  Dr. Maast diagnosed plaintiff with disc disease, depression, anxiety and vertigo.  (Id.). He found that plaintiff suffered from "severe" neck and back pain, as well as "severe depression.  (Id.).  This pain was "radiative up her neck" and "radiative" down her right lower extremities. (Id.).  Plaintiff also suffered from an "abnormal gait," "intermittent sensory loss" and spinal "tenderness."  (Id. at 274).  Her condition had created swelling, muscle spasms, atrophy, weakness, impaired appetite, weight change and difficulty sleeping.  (Id.).  Dr. Maast also found that plaintiff suffered from emotional problems and that the combination of ailments that afflicted her caused her "constantly" to lose attention and concentration.  (Id.).

These observations led Dr. Maast to recommend significant limitations on plaintiff's activities.  He found that she could sit and stand or walk for less than two

hours in any eight-hour work day.  (Id. at 275).  She needed to walk around for ten

minutes every hour during that day.  (Id.).  Plaintiff also needed a job that allowed

her to shift positions frequently and to take unscheduled breaks every ten or fifteen

minutes.  (Id.).  He recommended that she never lift or carry more than ten pounds,

and rarely carry less than that amount.  (Id. at 276).  Dr. Maast also found that

plaintiff should never twist, stoop, crouch or squat, climb ladders, or climb stairs.

(Id.).  She also, Dr. Maast concluded, should limit handling or fingering.  (Id.).

Plaintiff should not use her hands for more than 20% or her fingers for more than

50% of any workday.  (Id.).  Dr. Maast predicted plaintiff would miss four days per

month due to her condition.  (Id. at 277).  She also could not tolerate cold or rain.

(Id.).

      Dr. Maast's assessment also included a Mental Residual Functional Capacity

Questionnaire, which he completed on December 30, 2004.  (Id. at 268).  Dr. Maast

found depression, obsessive compulsiveness, and disc disease.  (Id.).  He found that

she had "difficulty coping with any stress at home or work."  (Id.).  He estimated that

she had a global assessment of functioning (GAF) score of 25.  (Id.).  Such a score

indicates "[b]ehavior [that] is considerably influenced by delusions or hallucinations

OR serious impairment in communication or judgment (e.g., sometimes incoherent,

acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost

all areas (e.g., stays in bed all day; no job, home, or friends.)"  DIAGNOSTIC AND

STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4th Ed. 1994).  Dr. Maast's

concluded that plaintiff was "seriously limited, but not precluded," "unable to meet competitive standards" or had "no useful ability to function" in sixteen categories of mental ability.  (Id. at 270).  Those categories included the ability to "remember work-like procedures," "maintain attention for two hour segment," "make simple work-related decisions," "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes" and "deal with normal work stress."  (Id.).

Other doctors also examined the plaintiff and provided reports.  Dr. Kenneth R. Lattimore treated plaintiff in 2002 and 2003.  (Id. at 212-14, 260).  Dr. Lattimore completed a form for the Proctor & Gamble disability benefit plan on August 20, 2002.  (Id. at 260).  That form indicated that plaintiff suffered from a "major depressive disorder" which was "recurrent" and "severe," and that she took medication to treat her condition.  (Id.).  Dr. Lattimore delcared plaintiff totally disabled as of June 11, 2002, but predicted that plaintiff would be able to return to work December 21, 2002.[1]  (Id.).  He also noted, however, that plaintiff would need to observe "physical restrictions as per plant MD."  (Id.).  Lattimore also provided the Bureau of Disability Determination with two "Physician Outpatient Progress Notes" he completed January and February 2003.  (Id. at 213-14).  Both of those notes reported that plaintiff's mood was "euthymic," which medical dictionaries define as

---

[1]A second examiner for Proctor & Gamble offered a similar date for plaintiff's total diability.  Mel Barvinchak, MSW, LSW completed a "Behavioral Health Physician's Certificate on October 3, 2002.  He reported that plaintiff had been diagnosed with a herniated disc, as well as mental disorders, and that she had been totally disabled since June 3, 2002.  (R. at 257).

"[r]elating to, or characterized by, euthymia (joyfulness; mental peace and tranquility; moderation of mood, not manic or depressed)." STEDMAN'S MEDICAL DICTIONARY, 627 (27th ed. 2000). Dr. Lattimore's notes also indicated that plaintiff did not complain of any hallucinations, delusions, suicidal ideations or homicidal intentions. (R. at 213, 214). He recommended that she continue with her present medications, though the notes do not indicate what those medications were. (Id.). Both notes indicated that plaintiff complained of a herniated disc in her back and that she had sought other diagnosis and treatment. (Id. at 213, 214). The February 14, 2003 note, however, indicates that plaintiff had yet to make an appointment with a surgeon. (Id. at 213).

Ihab Dana, M.D., examined plaintiff for the Pennsylvania Bureau of Disability Determination on December 16, 2003. (Id. at 215-217). Dr. Dana reported that plaintiff complained of a herniated disc in her back and depression. (Id. at 215). She reported that she had "problems off and on with pain" since injuring her back at work. (Id.). Her pain was "all over," causing difficulties in walking and forcing her to take medication. (Id.). She claimed to have been diagnosed with depression as well as with obsessive compulsive disorder. (Id.) Plaintiff was hospitalized at one point after a "nervous breakdown." (Id.). She reported taking several medications for her various ailments.[2] (Id. at 216). Dr. Dana found that plaintiff's extremities were in "normal" condition. (Id.). She could "move all her joints," and the "range of motion"

---

[2]Clonazepam, hydrocodone, wellbutrin and bextra. (R. at 216).

7

for her upper joints were "all within the acceptable range." (Id.).  Plaintiff could get on and off the examining table and walk on heels and toes. (Id.).  She could also "squat and rise from squatting position" and get up from a chair. (Id.).  Still, she experienced "a lot of pain however obviously on movement." (Id.).  Though "tender all over in the musculoskeletal area," plaintiff could "grasp, sit, bend talk and walk and lift." (Id. at 216-17).  Dr. Dana also found plaintiff's mental status "normal." (Id. at 217).  He assessed her as suffering from a "herniated disc and depression." (Id.).

Dr. Pamela J. Costello treated plaintiff for her back injuries in November 2003.[3]  Plaintiff complained to Dr. Costello of "acute onset of progressive low back pain, with bilateral radiating leg pain." (Id. at 247).  She reported that she had received physical therapy at Tyler Memorial Hospital beginning that month, but had found no relief. (Id.).  Among the symptoms listed by Dr. Costello were headaches, joint pain and anxiety and depression. (Id.).  Dr. Costello listed a past medical history of anxiety and depression. (Id.).  Her examination revealed that plaintiff was "tender" along her posterior lumber spine. (Id. at 248).  Tests of lumbar flexion and extension showed limits to that motion and accompanying pain in the legs and lower back. (Id.).  Plaintiff's gait was "within normal walking limits," as was her heel/toe walkikng. (Id.).  This latter form of walking "increased low back pain." (Id.).  An

---

[3]The magistrate judge indicates that this treatment lasted from April 2001 to October 2004.  (Report and Recommendation (Doc. 11) at 9).  The record reflects only one doctor's visit, in November 2003.

examination of plaintiff's MRI revealed a central L4-5 disc herniation.[4] (Id.). Dr. Costello diagnosed plaintiff with lumbar herniated nucleus pulposus (HMP) with low back pain and radiculopathy. (Id. at 249). She prescribed Bextra, Vicodin and Ativan, along with physical therapy. (Id.). Dr. Costello also recommended that plaintiff "continue with moderate activity restrictions." (Id.).

State agency physician Mary Ryczak, M.D., reviewed plaintiff's medical records and made a determination of her Residual Functional Capacity (RFC) on December 30, 2003. (Id. at 220). Dr. Ryczak did not examine plaintiff herself, but used records of plaintiff's MRIs and Dr. Dana's report. (Id. at 221-222). Dr. Ryczak concluded that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds and could stand or walk with normal breaks for about six hours a day. (Id. at 221). She also determined that plaintiff could sit for about six hours a day, and could push and pull for an unlimited amount of time per day. (Id.). Dr. Ryczak also noted postural limitations: while plaintiff could "frequently" balance, stoop, kneel, crouch and crawl, should could only occasionally climb ramps, stairs, ladders, ropes and scaffolds. (Id. at 222). Dr. Ryczak found no manipulative, visual communicative or environmental limitations. (Id. at 223-224).

---

[4]A January 20, 2003 MRI exam revealed a "loss of disc height and signal" at L4-5, as well as "moderate central disc herniation," "hypertrophic changes seen in the facets" and "neural foramen [that] are narrowed bilaterally, right greater than left." (R. at 252). An April 19, 2001 MRI revealed similar L4-5 problems, and noted that "[t]here is some slight loss of signal in the L4-5 lumber intervertebral disc indicating early desiccation of this disc." (Id. at 253). That disc also seemed to indicate a potential "extruded herniated disc." (Id. at 253-54).

State-agency psychologist John D. Chiampi, Ph.D., completed a Psychiatric Review Technique Form for the plaintiff on January 6, 2004.  He did so on the basis of his review of plaintiff's medical records.  Dr. Chiampi found a history of depression, but noted that no treatment had occurred since 2003.  (Id. at 240).  Dr. Chiampi's report noted that plaintiff suffered from an impairment that was not severe, and that this impairment stemmed from an affective disorder.  (Id. at 228).  He defined this affective disorder as a "disturbance of mood, accompanied by a full or partial manic or depressive symptom."  (Id. at 231).  The report, however, indicated that plaintiff suffered neither from a complex depressive syndrome or a manic syndrome, but instead from a form of depression that was "a medically determinable impairment . . . that does not precisely satisfy the diagnostic criteria [laid out] above."  (Id.).  Dr. Chiampi evaluated the limitations caused by plaintiff's mental condition, concluding that she suffered form a "mild" "restriction of activities of daily living," "difficulties" in "maintaining social functioning" and "maintaining concentration, persistence, or pace" and no "episodes of decompensation, each of extended duration."  (Id. at 238).  He found that plaintiff's medical history did not indicate a mental illness that would qualify her as *per se* disabled.  (Id. at 239).

The ALJ was also aware of two episodes of hospitalization due to plaintiff's psychological problems.  Plaintiff was hospitalized in Spring 2002, after her brother died.[5]  (Id. at 54).  Plaintiff's mental state also led to her hospitalization in May 2005.

---

[5]No documents related to this treatment are in the record.

(Id. at 56).  Plaintiff was admitted to the Robert Packer Hospital in Sayre,

Pennsylvania exhibiting "bizarre behavior" and "irrelevant talking."  (Id. at 307).  Jay

Shaw, M.D., the doctor who examined patient upon her admission on May 12, 2005,

reported that patient was "laughing and talking inappropriately," and admitted to

"having racing thoughts" and difficulty concentrating.  (Id. at 309).  Plaintiff had been

"decompensating for the past week," thinking that her son had been reincarnated.

(Id.).  She had been discovered wandering in a cemetary with a stroller, "waiting for

her son to come" and talking "excessively and irrelevantly."  (Id.).  Plaintiff appeared

extremely "'hyper,'" moving "'a mile a minute.'"  (Id.).  She also had "grandiose"

delusions, thinking she had been on television all weekend.  (Id.).  Shaw reported

that plaintiff admitted that she "does smoke marijuana."  (Id.).  He diagnosed her with

"bipolar mood disorder, mania, with psychotic features."  (Id. at 310).  Dr. Shaw

admitted patient to the hospital "to monitor her safety and the safety of others."  (Id.).

He planned to start her on Depakote to address her mental condition.  (Id.).

     After eight days of hospitalization, plaintiff was discharged and referred to

Rachel Hare, a social worker.  (Id. at 313).  Hare examined plaintiff May 23, 2005,

and reported that  plaintiff was "still manic" but "coherent and [exhibiting] no

delusional content."  (Id. at 318).  Hare noted that plaintiff did not have a problem

with alcohol, but that she "likes her pot."  (Id.).  Plaintiff claimed that she did not use

the drug because it was illegal, though.  Hare noted that hospital records indicated

that she had earlier admitted to use.[6]  (Id.).  She diagnosed plaintiff with "bipolar disorder, most recent manic with psychotic features."[7]  (Id.).

Judge Sweeney issued her decision on August 10, 2005.  Judge Sweeney concluded that plaintiff was "not disabled within the meaning of the Social Security Act."  (R. at 16).  She found that plaintiff suffered from lumbar spondylolysis at L4/5, a herniated disk and a major depressive disorder.  (Id. at 18).  Though these impairments were "'severe'" under Social Security regulations, that did not singly or in combination meet or medically equal a listing under the administration regulations.  (Id.).  The ALJ also described the diagnoses and assessments offered by plaintiff's doctors and social workers, including their opinions of her mental state.  (Id.).  She particularly noted that plaintiff had tested positive for marijuana and alcohol.  (Id. at 18-19).  Plaintiff's complaints of back, neck and knee pain, the ALJ found, were not entirely consistent.  (Id. at 19).  Despite claims that her condition limited physical activity, plaintiff contended that she often walked up to fifteen miles a day.  (Id.)  She also complained of depression, but sought no treatment for that disease.  (Id.).  This medical history led the ALJ to conclude that while plaintiff had mental and physical limitations, she "would still be capable of unskilled work."  (Id.).

---

[6]We note that these two reports are the only indications that plaintiff ever used illegal drugs, and that neither report is verified by any sort of toxicology report.  None of those who examined plaintiff stated that she suffered from any sort of addiction.

[7]Hare also assigned plaintiff a GAF score of 45, which "indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job.)" DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4 th ed. 1994).

The ALJ also evaluated the weight that should be accorded evidence from the doctors, social workers and administrators who evaluated the plaintiff.  She concluded that "significant weight" should be given to a State Agency assessment that found that plaintiff maintained a residual functional capacity that would allow her to engage in light work.  (Id.).  That assessment, the ALJ found "seems supported by the record."  (Id.).  The ALJ gave "[l]imited weight" to a State assessment that did not find evidence of severe mental impairment.  (Id. at 20).  Records from both Dr. Maast and Dr. Latimore demonstrated that plaintiff suffered from such a condition.  (Id.).  The ALJ did not accord the same weight to Dr. Maast's assessment of plaintiff's physical limtations, finding that "they seem overly restrictive and are not supported by the remainder of the record."  (Id.).  She also discounted the opinions of plaintiff's social workers, as they were "not an acceptable medical source."  (Id.).

With this information, the ALJ formed an assessment of plaintiff's residual functional capacity.  Plaintiff, she found, was "limited to a range of light work with normal breaks."  (Id.).  She could "occasionally climb stairs, stoop, kneel, crouch, or reach overhead with the bilateral extremities."  (Id.).  At the same time, plaintiff could "never climb ropes, ladders, scaffolds or crawl," but could "occasionally tolerate exposure to extreme cold, humidity or concentrated exposure to water/liquids."  (Id.).  The ALJ also concluded that plaintiff could "never tolerate loud or very loud noise, work in high exposed places or around fast moving machinery on the ground."  (Id.).  Plaintiff's mental condition, manifested in "occasional difficulties with sleep

13

disturbance, depressed mood, anxiety, appetite disturbance, tearfulness, and obsessive thoughts," also led to the ALJ's conclusion that plaintiff was "limited to unskilled work." (Id.).

After concluding that plaintiff could not perform any of her past relevant work, ALJ Sweeney proceeded to discuss whether plaintiff could perform any other relevant work available in significant numbers in the national economy. Taking into account plaintiff's residual functional capacity and vocational profile, the ALJ concluded that plaintiff was "capable of performing a significant range of light work as defined in 20 CFR §§ 404.1567 and 416.967." Since the ALJ determined that plaintiff could not perform a full range of light work, she consulted with a vocational expert to determine "whether jobs exist in the national economy for an individual of the claimant's age, education, past relevant work experience and residual functional capacity as determined." (Id. at 21). The expert determined that plaintiff could work as a "light inspector," and a "sedentary stuffer." (Id.). Both these jobs existed in signficant numbers both regionally and nationally. (Id.). Given these considerations, ALJ Sweeney concluded that "the claimant retains the capacity for work that exists in significant numbers in the national economy and is not under a 'disability' as defined in the Social Security." (Id.).

On April 25, 2006, after the Social Security Appeals Council denied her appeal, plaintiff filed a complaint in this court challenging the determination. (See R. at 11); Complaint (Doc. 1)). The parties then filed briefs, and on December 29,

2006, Magistrate Judge Thomas M. Blewitt issued his report and recommendation in this case (Doc. 11).  Judge Blewitt denied each of the plaintiff's contentions on appeal of the Administrative Law Judge's decision.  He found that the ALJ had met her obligation to fully develop the record by continuing plaintiff's initial hearing and allowing plaintiff opportunities over nine months to update the record with more recent medical information.  Judge Blewitt also found that the ALJ had properly refused to give controlling weight to the opinions of plaintiff's treating physician.  He found that the medical evidence in the record contradicted this doctor's diagnosis and that the plaintiff herself had reported limitations different from those that her doctor reported.  Plaintiff also did not suffer from a listed impairment, Judge Blewitt found, nor did she suffer from a disability when the court excluded consideration of any alcohol or illegal substance abuse.  Finally, the magistrate judge found that the ALJ had met her burden in determining that the plaintiff could perform work available in the national economy.  He recommended that we deny plaintiff's appeal.

Plaintiff filed objections to the report and recommendation on January 19, 2007.  Defendant filed a brief in opposition on January 24, 2007, bringing the case to its present posture.

**Jurisdiction**

We have jurisdiction over the instant action pursuant to 42 U.S.C. § 405 (g).[8]

---

[8]"Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after

**Standard of Review**

In disposing of objections to a magistrate judge's report and recommendation, the district court must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v. Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The district court may also receive further evidence or recommit the matter to the magistrate judge with instructions.  Id.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).

The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to perform in the workplace.  In order to receive disability benefits, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

─────────────────────

the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.  Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has the principal place of business."  42 U.S.C. § 405(g).

16

can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A).  The Act further provides that a person must "not only [be]

unable to do this previous work but [must be unable], considering his age, education,

and work experience, [to] engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the

immediate area in which he lives, or whether a specific job exists for him, or whether

he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A); Heckler v.

Campbell, 461 U.S. 458, 459-60 (1983).

        In analyzing disability claims, the Commissioner employs a five-step

sequential evaluation.  20 C.F.R. § 416.920.  The initial three steps are as follows: 1)

whether the applicant is engaged in substantial gainful activity; 2) whether the

applicant has a severe impairment; 3) whether the applicant's impairment meets or

equals an impairment listed by the Secretary of Health and Human Services as

creating a presumption of disability.   If claimant's impairment does not meet

requirement 3, the claimant must demonstrate 4) that the impairment prevents him

from doing past relevant work.  See 20 C.F.R. §§ 404.1520, 416.920.  If the applicant

establishes steps one through four, then the burden is on the Commissioner to

demonstrate the final step:  5) that jobs exist in the national economy that the

claimant can perform.  Jesurum v. Secretary of the U.S. Dept. of Health and Human

Services, 48 F. 3d 114, 117 (3d Cir. 1995).

**Discussion**

17

Plaintiff raises four objections to the report and recommendation. We will address each in turn.

### i. The Magistrate Judge Erred in Finding that the Administrative Law Judge Complied with Her Duty to Develop the Record

Plaintiff argues that an Administrative Law Judge has an obligation to ensure the development of an adequate administrative record, and that the ALJ failed to do so here. Plaintiff contends that the ALJ placed this obligation on the plaintiff at the second administrative hearing, insisting that plaintiff was responsible for failing to provide more medical records from her treating position. This insistence, plaintiff contends was error and should be grounds for reversing the ALJ's decision.

Plaintiff cites to cases from the Second Circuit Court of Appeals to argue that we should impose on the ALJ an "affirmative obligation to develop the administrative record." (Plaintiff's Objections to the Magistrate Judge's Report and Recommendation (Doc. 12) at 1) (citing Umanski v. Apfel, 2001 U.S. App. LEXIS 6089 (2d Cir. 2001); Pratts v. Chater, 94 F.3d 34 (2d Cir. 1996); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see also Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004) (holding that "while it is true that the Commissioner bears the burden at step five, 'the ALJ, unlike a judge in a trial, must herself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'") (quoting Pratts, 94 F.3d at 37). The Third Circuit has elaborated a similar standard, especially when a claimant proceeds *pro se*. In such a setting, "[a]n ALJ owes a

duty to a *pro se* claimant to help him or her develop the administrative record."

Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  Though the court does not

"prescribe any particular procedures that an ALJ must follow," those procedures

must assist in developing an adequate record in the case.  Id.  Significantly for this

case, the court has found that such action could include "request[ing] additional

medical records."  Id.

   Here, plaintiff complains that the ALJ did not properly assist her in developing

the record.  While plaintiff does not point to specific evidence that should have led

the ALJ to supplement the record before her, our examination of that record

indicates that the ALJ was aware at plaintiff's June 14, 2005 *pro se* hearing that

more medical evidence was available than she had received.[9]  At the hearing, for

---

[9]At plaintiff's June 14, 2005 hearing, the ALJ and plaintiff discussed a hospitalization for mental illness that plaintiff had apparently experienced.  The ALJ had no record of this hospitalization.  She told the plaintiff that "I can just tell you that you've chosen to represent yourself, and as far as I can tell, you truly don't know what's in the file.  So I'm going to keep going, and I'm going to try and get as much information as possible.  But when I'm done, I'm going to send this file to the hearing office there.  You should come in very quickly because I will not be deciding this case until you do so, and I won't leave it there long . . . I'll be sending this file there.  You need to look at it.  You need to see if it's complete.  If it's not complete, you need to send me what's missing, and I'll decide what we need to do."  (R. at 55).  The ALJ issued her decision in this matter on August 10, 2005. No evidence indicates that plaintiff had reexamined the record as directed by the ALJ, or that plaintiff added any information to her file after this discussion with the ALJ.  The medical evidence in the case, however, does not seem complete.  There are records of a June 12, 2002 psychological evaluation of the plaintiff, but no indication of who performed the evaluation and no other hospital records.  (See Id. at 314-316).  Records of a June 3, 2002 evaluation by Mel Barvinchak written and typed in the same style seemed to indicate that he produced both evaluations, but the record does not affirm that.  (See Id. at 319-322).  These forms are an indication, however, of the incompleteness of plaintiff's medical records.  Important information seems absent.  Similarly, though plaintiff contends that she saw Dr. Costello more than once, but less than five, times, only one medical report from Dr. Costello appears in the record.  (See Id. at 63, 246-248).  No evidence exists to show

instance, the plaintiff informed the ALJ that she had attended physical therapy as prescribed by a Dr. Costello.  (Id. at 67).  The ALJ informed plaintiff that she did not have any records of physical therapy.  (Id.).  She did not, however, ask the plaintiff to produce such records or attempt to assist her in securing them.  (Id.).  Similarly, plaintiff reported that she had seen a chiropractor.  (Id.).  Again, no records existed of those visits.  (Id.).  Plaintiff promised to get information from the chiropractor, but none appears in the record.  (Id. at 68).  In addition, the ALJ noted that the records from plaintiff's treating physician were "fairly complete," but told the plaintiff she was "paging through so I don't mislead [plaintiff], so I'll know what we're missing."

Plaintiff was unrepresented at this hearing, and the ALJ remarked that the medical information presented to her was lacking.  Several of the treatments that plaintiff received for her physical and mental ailments were not represented in the record, as the ALJ noted.  Despite what she recognized as inadequacies in a record that left out important indicators of plaintiff's physical condition, the ALJ issued a decision less than sixty days after informing plaintiff that she did not have necessary medical information.[10]  Because the ALJ was aware of missing medical information in a *pro se* plaintiff's case and did not act to ensure that the allegedly missing

_____

that ALJ actually sent the record for plaintiff to examine as she had promised.  This indicates that the ALJ did not do her job in assisting plaintiff, who was proceeding *pro se* in developing the record.

[10]The incomplete nature of plaintiff's mental health records is especially important, as plaintiff's behavior as evidenced in the record indicates that her mental health problems may be more severe than the present record indicates.

20

information was either produced or unavailable, we find that the ALJ did not fulfill her duty to develop the record in this case.  We will adopt the plaintiff's objection on this point.  On remand, the ALJ should not make a determination on plaintiff's status without taking careful steps to ensure that she has all the available medical records necessary to make her decision.

### ii.  The Magistrate Judge Erred in Finding that the ALJ Gave the Testimony of Treating Physicians Proper Weight

The plaintiff argues that the magistrate judge improperly gave limited weight to the opinion of her treating physician, Dr. Clarence Maast, of her residual functional capacity and her physical and mental impairments.  Plaintiff argues that the opinion of a treating physician carries a heavier weight as a matter of law than those of reviewing physicians, and cannot be overturned without substantial evidence supporting an opposing view.  Dr. Maast's long-term treatment of the patient, plaintiff argues, provides him with a fuller picture of her capacity and disabilities.  She contends that the magistrate judge's failure to credit his findings was error.

"A cardinal principle governing disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422,429 (3d Cir. 1999)).  When the treating physician's opinion "conflicts with that of a non-treating, non-examining physician,

the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Id. (quoting Plummer, 186 F.3d at 429).  An ALJ may reject a treating physician's medical opinion, but may do so "'only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." Id. at 318 (quoting Plummer, 186 F.3d at 429).

In this case, the ALJ gave only limited weight to the opinion of Dr. Maast, plaintiff's treating physician.  In deciding not to give greater weight to this opinion, the ALJ  concluded only that Dr. Maast's opinions "seem overly restrictive and not supported by the record." (R. at 20).   The ALJ does not point to specific places where the medical evidence contradicts Dr. Maast's assessment, but instead appears to speculate based on her assessment of Dr. Maast's credibility.  An ALJ may not reject the treating physician's opinion based on such grounds.  The ALJ also rejected Dr. Maast's assessment of plaintiff's medical condition because "he is a family practitioner and this outside his area of expertise." (Id.).  The ALJ did not point to specific, more reliable medical evidence that contradicts Dr. Maast's findings on plaintiff's mental condition.  The ALJ does reference a social worker's findings about plaintiff's alleged drug use, but she also notes that "the assessments by the social workers are not from an acceptable medical source." (Id.).  The ALJ likewise did not, therefore, provide an adequate basis for rejecting the opinion of plaintiff's treating physician on her mental condition.

In light of our decision to remand to the ALJ with instructions to develop the

22

record more fully, we will not direct the ALJ at this point to adopt Dr. Maast's opinion.

Instead, we direct the ALJ to reassess and more fully explain her reasons for

adopting or rejecting Dr. Maast's opinion in light of the new evidence she discovers.

This opinion on the relative weight to give Dr. Maast's opinion should be made only

after the ALJ ensures that all the relevant and available medical evidence is before

her.

### iii.  Did The Magistrate Judge Err in Finding that the Plaintiff was not Disabled?

Plaintiff argues that had the magistrate judge properly credited the opinions of

Dr. Maast he would have concluded that she was eligible for disability benefits.

Though plaintiff does not dispute that alcohol and drug abuse noted by some health-

care providers cannot be considered in determining an applicant's disability status,

she contends that her doctor's findings that she suffered from physical disabilities

related to her back and spine, combined with a diagnosis of mental illness, meant

that she was at best incapable of performing her previous relevant work.  In light of

our finding that the case should be remanded to the ALJ to further develop the

record, we will not determine whether to adopt the report and recommendation on

this point.  On remand, the ALJ should reevaluate whether plaintiff is *per se* disabled

based on the newly developed evidence.

### iv.  Did the Magistrate Judge Err in Finding that the ALJ Met Her Burden in Determining that Plaintiff Could Perform Relevant Work?

23

Plaintiff argues that the magistrate judge erred in concluding that she could perform work that existed in significant numbers in the national and regional economy.  The ALJ, plaintiff argues, asked improper hypothetical questions of the vocational expert that did not describe accurately the plaintiff's particular condition. The ALJ did not describe the physical limitations that Dr. Maast determined existed, and therefore did not allow the expert to form an accurate impression of the work plaintiff could perform.  Because we have determined that the case should be remanded to the ALJ to further develop the record, we will not address this objection. On remand, the ALJ should base her hypothetical questions on the new evidence she develops and on a reassessment of whether to accord controlling weight to the opinions of plaintiff's treating physician.

**Conclusion**

For the above-stated reasons, we will adopt the plaintiff's first two objections and remand the case to the ALJ for further proceedings consistent with this opinion. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERESA A. MARBARKER,** | : | **No. 3:06cv860** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL J. ASTRUE, Commissioner** | : | |
| **of Social Security,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

**AND NOW**, to wit, this 27th day of September 2007, the plaintiff's objections (Doc. 12) to the magistrate judge's report and recommendation (Doc. 11) are **ADOPTED** in part and **DISMISSED** in part.  The case is **REMANDED** to the Administrative Law Judge for further proceedings consistent with this opinion.

                                    **BY THE COURT**


                                    **s/ James M. Munley**
                                    **JAMES M. MUNLEY**
                                    **United States District Court**